1

**Sanjay S. Schmidt (SBN 247475)**
**LAW OFFICE OF SANJAY S. SCHMIDT**

2

1388 Sutter Street, Suite 810
San Francisco, CA 94109

3

T: (415) 563-8583

4

F: (415) 223-9717
ss@sanjayschmidtlaw.com

5

6

**T. Kennedy Helm, IV (SBN 282319)**
**HELM LAW OFFICE, PC**

7

644 40th Street, Suite 305
Oakland, CA 94609

8

T: (510) 350-7517
F: (510) 350-7359

9

kennedy@helmlawoffice.com

10

*Attorneys for Plaintiff*

11

**UNITED STATES DISTRICT COURT**

12

**NORTHERN DISTRICT OF CALIFORNIA**

13

14

**S.L.**, a minor, by and through her mother and proposed guardian ad litem, Karen Josephs, individually and as successor in interest to Decedent **ARON LEWANDOWSKI**,

15

16

        Plaintiff,

17

      vs.

18

19

**COUNTY OF TRINITY**, a municipal corporation; **TIM SAXON**, Trinity County Sheriff-Coroner, individually; **RON WHITMAN**, Trinity County Sheriff's Corporal, individually; **JOSHUA FORD**, Trinity County Sheriff's Sergeant, individually; **MARCUS TREANOR**, Trinity County Correctional Officer, individually; **ANDREW ROBBINS**, Trinity County Sheriff's Deputy, individually; **CONNIE CESSNA-SMITH**, MPA, Director of Trinity County Behavioral Health Services, individually; **MICHAEL NOVAK**, P.A., individually; **LINDA KRONER**, Trinity County Behavioral Health Case Manager, individually; and DOES 1-50, jointly and severally,

20

21

22

23

24

25

26

27

Case No. 3:24-cv-02211

**FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1. 42 U.S.C. § 1983 –
   Civil Rights Violations
2. 42 U.S.C. § 1983 – *Monell* and
   Supervisory Liability
3. California Civil Code § 52.1 (b) – State
   Civil Rights Violations
4. California Government Code § 845.6 –
   Failure to Summon Medical Care
5. Negligence

28

*S.L. v. County of Trinity, et al.*
FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
Case No. 3:24-cv-02211

1

1   Defendants.                    )
                                   )
2   _____)

3        Plaintiff, by and through her attorneys, the LAW OFFICE OF SANJAY S. SCHMIDT and

4   HELM LAW OFFICE, PC, for her First Amended Complaint, filed pursuant to Federal Rule of

5   Civil Procedure 15(a)(1), against Defendants, states the following:

6                                   **<u>INTRODUCTION</u>**

7        This case arises out of a tragic and preventable in-custody death. Plaintiff S.L.'s father,

8   ARON LEWANDOWSKI ("Decedent" or "LEWANDOWSKI"), a despondent and acutely

9   mentally ill pretrial detainee, completed suicide on Saturday February 26, 2023, after being denied

10  desperately needed mental-health services in the COUNTY OF TRINITY's jail, despite submitting

11  a request for behavioral health services on February 23, 2023, on which he reported being suicidal,

12  including being depressed, worried, fearful, having trouble sleeping, hearing voices (i.e.,

13  experiencing auditory hallucinations), and having suicidal thoughts. Notably, the Decedent

14  initialed the box on the form that indicated his condition was an **emergency**, answering the

15  following query affirmatively: "If you believe that your condition presents an <u>urgent</u> risk to

16  yourself or others, please mark this line with your initials." This is important because February 23,

17  2023, happened to be a Thursday, and according to the request form: "Mental Health counselors

18  visit each Wednesday. Except for emergencies, all requests are seen at those times." Even though

19  the Decedent indicated his condition was an emergency and, thus, he needed to be seen, assessed,

20  and treated right away, despite the Decedent's well-documented history of suicidal ideation, acute

21  mental illness, and auditory hallucinations, and despite his lack of qualifications for conducting a

22  suicide-risk assessment, Defendant Trinity County Correctional Officer MARCUS TREANOR

23  took <u>no</u> emergency action in response to the Decedent's submission of a request for emergency

24  behavioral health services – an obvious cry for help. The only action Defendant TREANOR took

25  was to email Defendant Trinity County Sheriff's Deputy ANDREW ROBBINS, another individual

26  unqualified to perform a comprehensive suicide-risk assessment, who also took no action. Three

27  days later, on February 26, 2023, without ever receiving the emergency mental-health care he

28

requested, and after being sent back to his cell when he was about to call his mother and not being afforded the opportunity to talk to her, LEWANDOWSKI asphyxiated himself in his cell. He was then sent to Mercy Medical Center, where he was declared brain-dead, on March 2, 2023.

## JURISDICTION

1.   This is a civil-rights, wrongful death/survival action, arising from Defendants' deliberate indifference to and failure to provide for the pretrial detainee-Decedent's serious, emergent mental-health and medical needs, failure to provide treatment and failure to impose suicide precautions, failure to summon necessary medical care, negligence, and failure to perform other legal obligations concerning the Decedent's serious medical needs, which occurred in the Trinity County Jail, in the County of Trinity, California, resulting in the death of LEWANDOWSKI by suicide, on March 2, 2023. The Decedent had a history of suicidal ideation, auditory hallucinations, and other acute mental disorders, and he endured prolonged isolation in the Defendants' jail without appropriate supervision and treatment.

2.   Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because this case is being brought to obtain compensatory and punitive damages for the deprivation, under color of state law, of the rights of citizens of the United States that are secured by the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988.

3.   This action is brought pursuant to the First and Fourteenth Amendments to the United States Constitution and the laws and Constitution of the State of California.  Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367 (a), to hear and decide claims arising under state law.

## PARTIES AND PROCEDURE

4.   Minor Plaintiff S.L. is and was at all times herein mentioned the only biological child of LEWANDOWSKI and is a resident of the County of Marin, in the State of California. She is being represented in this matter by her mother and proposed guardian ad litem, Karen Josephs, whose application pursuant to Federal Rule of Civil Procedure 17(c) will be filed shortly hereafter. Minor Plaintiff S.L.'s proposed guardian ad litem, Karen Josephs, is a resident of the County of Marin,

in the State of California. Minor Plaintiff S.L. brings these claims individually for wrongful death, Cal. Code Civ. Proc. §§ 377.60 *et seq.*, and as successor in interest for her father, LEWANDOWSKI, pursuant to California Code of Civil Procedure §§ 377.11 and 377.20 *et seq.*, and for violations of her personal rights. A successor-in-interest declaration signed by minor S.L.'s proposed guardian ad litem is filed herewith as an **EXHIBIT 1**.

5. On information and belief, one or more named Defendants resides in this judicial district.

6. Defendant COUNTY OF TRINITY ("COUNTY") is a public entity, duly organized and existing under the laws of the State of California. Defendant COUNTY, under its authority, operates the Trinity County Jail ("TCJ") and is and was responsible for ensuring the provision of emergency, medical, and mental-health services to all Trinity County Jail inmates. Defendant COUNTY is responsible for ensuring that the basic human needs of individuals in its custody are met, and for ensuring that inmates are not at risk of serious harm, including by providing appropriate services, funding, oversight, and corrective action to ensure adequate conditions. Defendant COUNTY is also responsible for ensuring that jail policies and practices do not violate inmates' constitutional rights or put them at risk of serious harm, including by suicide, because they are denied necessary mental health services and/or are unable to properly care for themselves. Defendant COUNTY, by law, possesses the ultimate authority over and responsibility for the medical care, mental-health care, treatment, and physical safekeeping of all incarcerated persons in the Trinity County Jail, including LEWANDOWSKI. Defendant COUNTY also operates and manages the Trinity County Sheriff's Office ("TCSO") and the Trinity County Behavioral Health Services ("TCBHS"), the latter of which is charged with the provision of mental health services to the COUNTY's inmate population. Defendant COUNTY is and was at all relevant times mentioned herein responsible for the policies, procedures, and practices/customs of the TCSO, the TCBHS, any other COUNTY agencies that were responsible for the safety and mental health care of the Decedent, as well as the actions and/or inactions of all these agencies' employees and/or agents. Pursuant to California Government Code § 815.2, the COUNTY is vicariously liable for the state-law torts of its employees and agents, including the individual Defendants herein.

7.   Defendant TIM SAXON ("SAXON"), at all material times, was employed by Defendant COUNTY as Sheriff-Coroner, and was acting within the course and scope of that employment. As Sheriff-Coroner, Defendant SAXON was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all TCSO custodial employees and/or agents. Defendant SAXON, with the assistance of a small group of executive officers, is and was charged by law with the administration of the Trinity County Jail. Defendant SAXON also is and was responsible for the promulgation of policies and procedures and allowance of the practices and customs, pursuant to which the acts of the TCSO alleged herein were committed for the COUNTY, and at all material times, he was acting within the course and scope of that employment. Further, Defendant SAXON was ultimately responsible for the provision of medical and mental-health care to inmates at the Trinity County Jail, and all COUNTY policies, procedures, and training related thereto. Defendant SAXON is being sued in his individual capacity.

8.   Defendant RON WHITMAN ("WHITMAN"), at all material times, was employed as a Sheriff's Sergeant by Defendant COUNTY's TCSO and was acting in the course and scope of that employment at all material times.

9.   Defendant JOSHUA FORD ("FORD"), at all material times, was employed as a Sheriff's Sergeant by Defendant COUNTY's TCSO and was acting in the course and scope of that employment at all material times.

10. Defendant MARCUS TREANOR ("TREANOR"), at all material times, was employed as a Correctional Officer by Defendant COUNTY's TCSO and was acting in the course and scope of that employment at all material times.

11. Defendant ANDREW ROBBINS ("ROBBINS"), at all material times, was employed as a Sheriff's Deputy by Defendant COUNTY's TCSO and was acting in the course and scope of that employment at all material times.

12. Defendant CONNIE CESSNA-SMITH, MPA ("CESSNA-SMITH"), at all material times, was employed as the Director of Trinity County Behavioral Health Services, the COUNTY's agency also referred to herein as TCBHS. As Director, Defendant CESSNA-SMITH was

ultimately responsible for the provision of mental-health care in the Trinity County Jail. Defendant CESSNA-SMITH was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all TCBHS employees and/or agents of TCBHS working at the Trinity County Jail. Defendant CESSNA-SMITH was also responsible for the promulgation of the policies and procedures and allowance of the practices and customs, pursuant to which the acts of the COUNTY personnel alleged herein were committed. Defendant CESSNA-SMITH was and is responsible for creating, overseeing the creation of, approving of, and enforcing policies, procedures, and training related to the medical and mental health care of inmates in Defendant COUNTY's jail, including: assessing inmates for possible suicide risk; conducting training on conducting comprehensive suicide risk evaluations; ensuring that suicide precautions are not lifted without a proper assessment and without reasonable suicide prevention precautions; ensuring an individualized treatment plan is formulated and followed before suicide prevention precautions are lifted; ensuring an individualized safety plan is formulated, documented, and followed prior to the lifting of suicide precautions; instituting appropriate suicide precautions; approving housing classification; instituting appropriate observation to prevent suicide; ensuring a continuity of care; ensuring that, when the COUNTY's TCSO takes custody of an inmate that is hospitalized and transports them to the COUNTY's jail that there is a continuity of mental health care; instituting appropriate treatment plans for the serious mental health needs of inmates; communicating about an inmate's suicide risk with custodial staff, health care professionals, and outside facilities; ensuring compliance with state and federal law; and, ensuring compliance with court orders. On information and belief, Defendant CESSNA-SMITH was ultimately responsible for the COUNTY's provision of medical and mental health care to inmates at the jail, including ensuring that urgent mental health services were available to inmates that requested them, despite whether a Correctional Officer, Sheriff's Deputy, or other untrained gatekeeper refused to summon them, ensuring a continuity of care from a hospital setting to the COUNTY's jail, if the TCSO insisted on taking custody of a patient, training staff on conducting comprehensive suicide risk assessments, the assessment of inmates for possible suicide risk, instituting appropriate suicide-

prevention precautions and programs, and ensuring that inmates in COUNTY's care were not discharged from suicide precautions without a comprehensive suicide risk assessment, individualized treatment plan, and individualized safety plan. Defendant CESSNA-SMITH was acting within the course and scope of her employment with the COUNTY at all material times. Defendant CESSNA-SMITH is being sued in her individual capacity.

13. Defendant LINDA KRONER ("KRONER"), at all times mentioned herein, was employed by Defendant COUNTY as a Behavioral Health Case Manager in the COUNTY's jail, and was acting within the course and scope of that employment. Defendant KRONER, on information and belief, was the case manager for ARON LEWANDOWSKI while he was in custody at the COUNTY's jail, which meant she was responsible for ensuring his mental health needs were met, that he was provided adequate and appropriate treatment, and that an individualized treatment plan was developed and followed, including a safety plan, among other things. Defendant KRONER is being sued in her individual capacity.

14. Defendant MICHAEL NOVAK, P.A. ("NOVAK"), at all material times, was employed by the COUNTY under – and treating LEWANDOWSKI pursuant to – a contract to provide medical services for inmates in the Trinity County Jail and Trinity County Juvenile Detention Facility. When Defendant NOVAK undertook the duty to evaluate LEWANDOWSKI, he was responsible for ensuring LEWANDOWSKI's mental health needs were met, that he was provided adequate and appropriate treatment, and that an individualized treatment plan was developed and followed, including a safety plan, among other things. Defendant NOVAK is being sued in his individual capacity.

15. Certain DOE Defendants, at all material times, were employees and agents of Defendant COUNTY OF TRINITY, who were responsible for either the appropriate care of—or if they were not able to provide it or ensure it was provided—the transfer of LEWANDOWSKI to another appropriate inpatient facility, and failed or refused to do so, and/or were responsible for assigning LEWANDOWSKI to appropriate housing and housing classification, with appropriate suicide precautions, ligature device access restriction, and observation, given his suicide risk. In doing the

acts or omissions hereinafter described, certain DOE Defendants acted within the course and scope of their employment with Defendant COUNTY and acted under color of state law. The individually named Defendants and certain DOE Defendants were either Correctional Officers, Sheriff's Deputies, Sergeants, Captains, Lieutenants, other jail personnel, Doctors, Nurses, Licensed Clinical Social Workers, other mental-health professionals, medical professionals and/or civilian employees and/or agents of the COUNTY, who were responsible for the care, housing, observation, and safety of inmates, including LEWANDOWSKI, and/or the transfer of LEWANDOWSKI for inpatient psychiatric care.

16. The true names or capacities, whether individual, corporate, associate, or otherwise of Defendants named herein as DOES 1 through 50 are unknown to Plaintiff, who, therefore, sues said Defendants by said fictitious names. Plaintiff will amend this Complaint to show said Defendants' true names and capacities when the same have been ascertained. Plaintiff is informed, believes, and thereon alleges that all Defendants sued herein as DOES are in some manner responsible for the acts, omissions, and injuries alleged herein.

17. Despite Plaintiff's counsel's multiple requests for full records, Defendants have not provided Plaintiff's counsel with all documents, existing body-worn camera videos, surveillance videos, and other information concerning this tragic incident. Plaintiff is, therefore, ignorant of the true names and capacities of Defendants DOES 1–50, and, thus, sues these Defendants by such fictitious names. Plaintiff is informed and believes, and thereon alleges, that each Defendant so named is responsible in some manner for the injuries and damages sustained by Plaintiff as set forth herein. Plaintiff will amend her Complaint to state the names and capacities of each DOE Defendant, when they have been ascertained.

18. Plaintiff alleges, on information and belief, that each of the Defendants sued herein was wrongfully, deliberately indifferently, negligently, and/or otherwise responsible in some manner for the events and happenings as hereinafter described, and proximately caused injuries and damages to Plaintiff and/or Decedent. Further, one or more DOE Defendants was at all material times responsible for the hiring, training, supervision, and discipline of other defendants, including

both the individually named and DOE Defendants.

19. DOE Defendants 1–30 were and/or are to-be-identified employees/agents of the COUNTY OF TRINITY, and at all material times acted under color of law and within the course and scope of that employment.

20. DOE Defendants 31–40 were and/or are and/or may be to-be-identified employees agents of another municipality or municipalities, and at all material times acted under color of law and within the course and scope of that employment.

21. DOE Defendants 41–50 are of an unknown capacity, whether individual, municipal, corporate, or otherwise.

22. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship.

23. Plaintiff is further informed and believes, and thereon alleges, that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter otherwise, specifically alleged.

24. At all material times, each Defendant was jointly engaged in tortious activity, and was an integral participant in the events and violations of rights described herein, resulting in the deprivation of Plaintiff's and Decedent's constitutional rights and other actionable harm.

25. The acts and omissions of all Defendants, except any to-be-identified DOE Defendants, were at all material times pursuant to the actual customs, policies, practices, and/or procedures of the COUNTY OF TRINITY.

26. At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California.

27. Plaintiffs timely and properly presented a government code tort claim with the County of Trinity, pursuant to California Government Code § 910 *et seq*., and this action is timely filed within

*S.L. v. County of Trinity, et al.*
FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
Case No. 3:24-cv-02211

9

1   all applicable statutes of limitation.

2   28. This Complaint may be pleaded in the alternative, pursuant to Rule 8(d)(2) of the Federal

3   Rules of Civil Procedure.

4   **<u>GENERAL ALLEGATIONS</u>**

5   29. Plaintiff re-alleges each and every paragraph in this Complaint, as though fully set forth

6   here.

7   30. First, despite the obvious and immediate treatment needs of its inmate population for

8   mental-health services to be available 24 hours per day, 7 days per week, the COUNTY, by and

9   through its agencies, including the TCSO and the TCBHS, has an unconstitutional official policy,

10   custom, or practice of restricting mental-health care to Wednesdays only. Even though the policy,

11   custom, or practice—which is reflected in the COUNTY's "TRINITY COUNTY DETENTION

12   FACILITY INMATE REQUEST FOR BEHAVIORAL HEALTH SERVICES" form—provides

13   a box for an inmate to initial if the inmate believes their "condition presents an _urgent_ risk to

14   yourself or others," an inmate indicating their condition presents an urgent risk to themselves will

15   not necessarily be seen; the execution and operation of this policy, custom, or practice is that an

16   untrained Correctional Officer receives the request form from an inmate and acts as the gatekeeper

17   for whether a mentally unwell—including a suicidal—inmate will be seen by a mental-health

18   professional. Consequently, if an inmate is having a mental-health emergency requiring immediate

19   treatment on any day except a Wednesday, the COUNTY does not have any mental-health care

20   professionals available at its jail to assess and treat inmates, and, thus, an inmate will not be seen,

21   unless, on information and belief, untrained, unqualified Correctional Officers and Sheriff's

22   Deputies (who are not mental-health professionals) exercise their unbridled and unmerited medical

23   decision-making power and summon such care. LEWANDOWSKI and other inmates suffering

24   from the same mental health disabilities he suffered from were disabled, and this official policy,

25   custom, or practice is not consonant with the Americans with Disabilities Act ("ADA") – 42 U.S.C.

26   § 12132, Section 504 of the Rehabilitation Act of 1973 ("RA"), and the California Disabled

27   Person's Act, Cal. Civ. Code §§ 54 and 54.1 et seq.

28

31. Second, the COUNTY has a long-standing custom or policy of using restrictive housing. Restrictive housing—also known as solitary confinement, segregation, or isolation—is any type of detention that involves three basic elements: removal from the general population, whether voluntary or involuntary; placement in a locked room or cell, whether alone or with another prisoner; and the inability to leave the room or cell for the vast majority of the day. On information and belief, during his incarceration at the COUNTY's jail before he took his own life, the Decedent was subject to restrictive housing: he was only allowed out of his cell for one hour per day, and only one inmate would be allowed out at a time.

32. On information and belief, the COUNTY and Defendant SAXON have known since at least 2017 that the conditions in restrictive housing, including little or no out-of-cell time, may cause a pretrial detainee with or *without* psychiatric disabilities to develop them, or to become suicidal.

33. Third, the COUNTY has a long-standing custom or policy of failing to hire sufficient mental-health staff to provide competent intake/assessment, treatment, daily therapy, and urgent mental health treatment, such that it unreasonably restricts mental-health care to Wednesdays only, and even the care offered on Wednesday is not adequate. On information and belief, since before 2017, the COUNTY has not employed enough psychiatrists, therapists, and other mental-health professionals to meet the demands of its jail population. Without appropriate staffing, the COUNTY cannot implement the essential components of a constitutional mental-health care delivery system.

34. As a result of the official policy severely and unconstitutionally restricting access to emergency mental-health care, as well as other unconstitutional customs and policies identified above, inmates at the COUNTY's jail have completed suicide because the COUNTY's policy has denied them access to emergency mental-health care, has denied inmates access to adequate therapy, and has failed to train and supervise staff in conducting a comprehensive suicide risk assessment and also formulating and executing an individualized treatment plan and safety plan; consequently, in some cases, the inmates' conditions have deteriorated into self-harming behavior,

1   and in other cases, their depression, hopelessness, suicidality, and other suicide risk factors—both

2   acute and chronic—have gone untreated or have been inadequately treated, culminating in

3   completed suicides.

4       35. For example, in 2017, an inmate named William Jones died while in custody at COUNTY's

5   jail. The cause of death was suicide. And on January 8, 2024, a COUNTY Correctional Deputy

6   found that John Swain, a pretrial detainee, had died in one of the COUNTY's jail cells; he died of

7   asphyxiation due to self-strangulation.

8       36. On or about February 2, 2023, LEWANDOWSKI was found down; he had been stabbed

9   in his right eye. He underwent emergency surgery for a 7-cm laceration to his skull and was then

10   airlifted to UC Davis Medical Center ("UCD"), as a result of having been assaulted.

11   LEWANDOWSKI was airlifted to UCD from Mercy Redding hospital for Ophthalmology

12   specialty services, because of the acuity of the stab injury to his eye, among other injuries. He

13   needed to be evaluated and treated by the medical professionals at the Ophthalmology and Plastic

14   Surgery units of UCD because he had been stabbed in his right eye and had suffered a right middle

15   finger injury, among other injuries.

16       37. In LEWANDOWSKI's UCD medical records, which Defendants NOVAK, KRONER, and

17   other, to-be-identified medical professionals – as well as Defendant FORD and other named or

18   DOE TCSO Defendants – knew, had reason to know, or should have known contained such

19   information, LEWANDOWSKI was noted in his chronic medical problems to have **untreated**

20   **Major Depressive Disorder** ("MDD"), **MDD with psychotic features**, **acute stress disorder**,

21   and a **history of several suicide attempts**.

22       38. On February 3, 2023, LEWANDOWSKI was evaluated by Psychiatry at UCD because of

23   suicidal ideation. A number of recognized suicide risk factors were documented in his medical

24   records at this time, which Defendants FORD, NOVAK, KRONER, and other, to-be-identified

25   Defendants either knew of, had reason to know of, or should have known about. These records

26   documented that LEWANDOWSKI reported that, for the past 4-6 years, his life had been going

27   downhill; that his ex-wife divorced him during this time, taking custody of his teenage daughter;

28

he was homeless and transient; and that he attempted suicide during/after the divorce by stealing morphine/dilaudid from his wife and attempting to overdose. LEWANDOWSKI reported that he felt like he had nobody to support him, and that he was alone. LEWANDOWSKI reported that the suicidal ideation ("SI") he experienced in the morning of that day was "10 times worse" than the first episode of suicidal ideation he had experienced during his divorce. LEWANDOWSKI was noted to have feelings of hopelessness, and only fair judgment. He was started on mirtazapine (also known as Remeron), a medication for the treatment of MDD (a major depressive disorder), and was deemed to be no less than a moderate suicide risk based on acute risk factors that included substance use, hopelessness, and anhedonia, and chronic risk factors that included prior suicide attempts and psychiatric diagnosis, inter alia.

39. Additionally, on February 3, 2023, a speech evaluation showed LEWANDOWSKI had severe delayed memory deficits, moderate reasoning deficits, and moderate problem-solving deficits.

40. Notably, in LEWANDOWSKI's UCD medical records, which Defendants knew of, had reason to know of, or should have known of, the chronic and acute suicide risk that LEWANDOWSKI posed triggered an entry stating, "Do not allow AMA [i.e., against medical advice] discharge without psychiatric reassessment."

41. On February 3, 2023, LEWANDOWSKI's psychiatric note, which the COUNTY and individual Defendants, including Defendants FORD, NOVAK, KRONER, and others either knew of, had reason to know of, or should have known about, showed that LEWANDOWSKI endorsed continued SI, but stated he felt safe while in the hospital. LEWANDOWSKI reported two prior, failed suicide attempts, with the last one occurring around the time of his divorce, involving intentional overdose on "liquid morphine and Dilaudid" (a narcotic used to treat moderate to severe pain), and an aborted suicide attempt ("SA") involving holding a loaded pistol to his head. LEWANDOWSKI stated that if he were to be discharged, he did not feel he could keep himself safe and he might "do something stupid again". The assessment concluded that LEWANDOWSKI MUST receive a psychiatric evaluation—a California Welfare and Institutions Code § 5150

("5150") evaluation—after being fully medically cleared, and when he was ready for discharge from Mercy Redding (where he was *supposed* to go per the UCD discharge plan), because he continued to express active suicidal ideation, and may need inpatient psychiatric hospitalization. He was deemed to be no less than a moderate suicide risk at that time.

42. On February 4, 2023, LEWANDOWSKI was assessed by Dr. Christina Lee, a psychiatrist, as well as David Patron, MD, a resident, who noted that LEWANDOWSKI remained at no less than a moderate acute suicide risk while hospitalized and would be at an **elevated – high – risk if he were to be discharged**. These physicians noted that the current plan was to "repatriate to Mercy Redding", but that LEWANDOWSKI "**MUST receive a psychiatric 5150 evaluation after fully medically cleared and ready for discharge from Mercy Redding as he continues to express active suicidal ideation and may need inpatient psychiatric hospitalization**." This means that, in their medical opinion, before LEWANDOWSKI were discharged from an inpatient medical facility either to the outside or anywhere else—such as the COUNTY's jail—he would need a psychiatric 5150 evaluation, and would likely still need inpatient psychiatric hospitalization instead in order to remain safe, as well as to treat his acute mental health conditions.

43. The individual Defendants either knew this evaluation and likely inpatient hospitalization was needed, had reason to know this, or should have known this, at all material times.

44. On or about February 6, 2023, LEWANDOWSKI expressed to an RN that he wanted to hurt himself. LEWANDOWSKI met with a LCSW, who later called LEWANDOWSKI's mother, who stated she felt LEWANDOWSKI should be admitted to an inpatient psychiatric facility. LEWANDOWSKI's mother further told the LCSW that she was worried and scared for LEWANDOWSKI. The LCSW deemed LEWANDOWSKI to be a "**high suicide risk**." Various suicide precautions were imposed, including a sitter at his bedside, a full room safety sweep, and security and a mental-health worker remaining at LEWANDOWSKI's bedside. These precautions show the acuity of LEWANDOWSKI's suicidality and risk, and what was needed to keep him safe.

45. On February 7, 2023, LEWANDOWSKI's mother called a LCSW and stated that

LEWANDOWSKI had called her and stated he had active suicidal ideations and wanted to kill himself in the hospital. The LCSW continued to deem him a "HIGH suicide risk" and put him on safety precautions, including having a mental-health worker sit with him and having 1:1 security at his bedside.

46. On February 7, 2023, Dr. Martino, a psychiatrist, noted that the Decedent continued to be deemed a **high suicide risk**; the note indicates that LEWANDOWSKI had "called his ex-wife and discussed ways he could kill himself while in the hospital. May have been triggered by recent police arrival at bedside." Dr. Martino deemed LEWANDOWSKI to be a **high suicide risk** and concluded that all suicide precautions needed to remain in place: "Patient is to remain 1:1 sitter with high suicide risk precautions and always within line of sight."

47. On February 8, 2023, the Psychiatry note by LEWANDOWSKI's attending physician, Dr. Emilie Bhe and Andrew Yeung, a medical student, noted the following risk factors and protective factors in the suicide risk assessment: ACUTE: post-trauma, acute stressors, perceived burden on others, substance use, chronic or uncontrolled pain, hopelessness, and impulsivity; CHRONIC: male gender, prior suicide attempts, trauma hx, chronic medical illness, psychiatric diagnosis, and new physical disability; PROTECTIVE FACTORS: **this hospitalization**. Saliently, the hospitalization of LEWANDOWSKI in UCD itself was deemed to be a protective factor. The individual Defendants in this case either knew the hospitalization had been a protective factor, knew or had reason to know of this evaluation and that it was likely inpatient hospitalization was needed for LEWANDOWSKI, had reason to know this, or should have known this, at all material times.

48. Also on February 8, 2023, another psychiatrist, Jasmine McClendon, M.D., MPH, noted the following in her assessment: "Aron Phillip Lewandowski is a 44yr old male with past psych history of depression and suicidal attempts presenting with facial/eye stab injuries and hand wounds of unknown origin. Psychiatry initially consulted regarding SI 2/2 to chronic MDD and acute facial disfigurement. Interval history notable for patient with recent placement into custody and expression of increased SI to ex-partner/family members. Patient subsequently placed on high

risk suicide precautions. Overall presentation remains concerning for ongoing depressive symptoms and worsened SI, suspect 2/2 to multiple psychosocial stressors, and compounded by recent legal stressor. Overall presentation remains concerning for recurrent MDD, severe and presentation absent of disorganization, or overt psychotic or manic symptoms." Dr. McLendon's initial plan, subject to additional recommendations, was: "**Continue HIGH risk suicide precautions**; "Increase Remeron 30 mg QHS"; "Start Trazodone 50 mg QHS". Notably, Dr. McClendon indicated that: "If plan to discharge to custody, psychiatry will not perform 5150 evaluation, however patient recommended to receive 5150 evaluation in custody placement". At this time, LEWANDOWSKI was currently endorsing SI, and stated: "I can think of 30 ways to do it". He was again deemed to remain a **high suicide risk**.

49. On February 8, 2023, a full sweep of LEWANDOWSKI's room occurred for ligature devices and they were all removed. He made the following statements expressing suicidal ideation: "I constantly think about falling asleep and not waking up. I think about ways to end it, but it would be much harder now that there are people watching me." And, according to the RN's note, "[w]hen asked about patient'' untouched dinner, and asked to get alternative snacks he might be interested in, patient states 'I am not worried about eating. I don't need to get better.'"

50. At some point, the Decedent's discharge and treatment plan changed because the COUNTY's TCSO personnel had exerted their actual or apparent legal authority and changed the plan that had been formulated by LEWANDOWSKI's treatment team at UCD, which was to discharge LEWANDOWSKI to Mercy Medical Center in Redding, CA, but only after a 5150 evaluation had been conducted by a qualified member of the psychiatry team at UCD.

51. As of February 9, 2023, LEWANDOWSKI still had an officer at his bedside and a mental health worker 1:1 at his bedside, in UCD.

52. On February 9, 2023, LEWANDOWSKI continued to be on high risk suicide precautions, including "1:1 Sitter," and was deemed a "**High suicide risk**. Under Trinity County law enforcement custody." By this point, TCSO personnel had LEWANDOWSKI in constructive custody at the hospital. The medical staff at UCD regarded the Decedent as being under arrest, so

the plan was no longer to discharge the Decedent to an inpatient psychiatric facility.

53. On February 9, 2023, LEWANDOWSKI reported suicidal ideation and stated: "[I]f I were not in the hospital I would probably already be dead", but that "you all have people around me and I couldn't do it right now". LEWANDOWSKI was continued on "**HIGH** suicide risk precautions."

54. As of February 10, 2023, according to the UCD Case Manager, LEWANDWOSKI was in jail custody now. The plan changed, on information and belief, as a result of the COUNTY's Sheriff's Office exercising its power, and by virtue of the TCSO's actual and apparent legal authority, to instead take custody of LEWANDOWSKI and transfer LEWANDWOSKI to jail, contrary to the plan formulated by the medical professionals that were qualified to conduct a comprehensive suicide risk evaluation of LEWANDOWSKI—to transfer him to Mercy Redding, and then for him to be evaluated there for inpatient psychiatric hospitalization. According to the records, Defendant Sergeant FORD informed the UCD Case Manager that LEWANDOWSKI would be transported to Sacramento County Jail from UCD, and then from there, he would then be transported to the COUNTY OF TRINITY for incarceration.

55. On February 10, 2023, Defendant FORD called the UCD Case Manager and wanted to make sure that LEWANDOWSKI would only be released to the custody of the COUNTY, not out of the hospital.

56. On February 11, 2023, upon LEWANDOWSKI's discharge from Trauma Surgery, the Nurse Practitioner—as part of his discharge plan from UCD—indicated: "**Continue HIGH risk suicide precautions.**"

57. Nevertheless, Defendant Sheriff SAXON exercised the authority granted to him by law, either directly or by and through one of his subordinates, to take custody of LEWANDOWSKI from UCD, where that hospitalization itself remained a protective factor, where he was receiving daily mental-health care, psychiatric care, medication, and where he had continuously remained a moderate to high suicide risk with a whole panoply of suicide precautions in place, and instead, the COUNTY and Defendant SAXON took affirmative action to take custody of LEWANDOWSKI and move him from the safe and stable environment of UCD to the COUNTY's

jail, where he would not receive any such services and which was not a safe environment for an individual that posed a moderate to high risk of suicide.

58. On February 11, 2023, LEWANDOWSKI was discharged from UCD to the COUNTY's custody, and the COUNTY and its employees, thereby, assumed responsibility for the custody, care, wellbeing, and safety of LEWANDOWSKI. According to the UCD records, Defendant Sergeant FORD stated: "pt is not going to general med or infirmary, but going to administration segregation." The discharge notes by thee UCD RN state: "Pt dc'd to Trinity County jail accompanied by prison officers. … Dc packet given to the officers."

59. The UCD medical and mental-health professionals, as part of their discharge plan, ordered that LEWANDOWSKI continue mirtazapine per Psychiatry, and indicated that LEWANDWOSKI needed a psychiatric evaluation in prison.

60. Contrary to the UCD discharge plan, no COUNTY employees at any point after LEWANDOWSKI's discharge from UCD performed a comprehensive and adequate suicide risk evaluation on LEWANDOWSKI upon his later discharge to, and prior to his admission into, the COUNTY's jail.

61. With deliberate indifference to LEWANDOWSKI's serious medical needs, Defendant FORD decided to house LEWANDOWSKI in administrative segregation, or restrictive housing, while also failing to refer LEWANDOWSKI for adequate and intensive, mental health therapy and an appropriate and comprehensive psychiatric evaluation, thereby increasing the risk that LEWANDOWSKI would decompensate, suffer a psychiatric emergency, and engage in self-harm.

62. On February 11, 2023, at about 16:57 p.m., a TCBHS provider noted the following for COUNTY jail staff: "assessed inmate for SI and or harming others, No threat at this time released from watch." Thereafter, on February 15, 2023, at about 15:15pm, a TCBHS provider stated: "I went to the jail to assess inmate, [LEWANDOWSKI], just came back from court, there he found out what he was being charged. On the way back to the county jail; [LEWANDOWSKI], made suicide statements when I spoke with [LEWANDOWSKI]; he wasn't making much sense, I wasn't comfortable taking him off  S.W due to his; not eating, making statements such as 'do feed the

*S.L. v. County of Trinity, et al.*
FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
Case No. 3:24-cv-02211

18

body; that's how you kill the body', I left him on suicide watch and inform the crisis worker that does the 5:00pm-8:00am shift."

63. Between February 11, 2023, and February 15, 2023, LEWANDOWSKI exhibited self-harming behavior, including but not limited to, refusing to eat or drink any water.

64. On February 13, 2023, LEWANDOWSKI used another inmate's phone to make a call to his mother, Lisa Nugent. He was sobbing during this call and did not understand what was going on. He also reported that he was not receiving medication or medical care, and that he had been crying all day. He was hopeless.

65. The inmate that had allowed LEWANDOWSKI to use his phone reported to Ms. Nugent that LEWANDOWSKI was not eating, was sleeping all day, was acting very odd, and would not get his own tablet to make phone calls. It was obvious to this inmate and others that LEWANDOWSKI was extremely unwell; as such, it would have been obvious to the Defendants, including the Correctional Officers, Deputies, and other COUNTY employees that LEWANDOWSKI was extremely distraught, depressed, unwell, was unable to care for himself, and, thus, these factors coupled with any statements of suicidal ideation would have made it reasonably clear that the Decedent posed a suicide risk.

66. On February 15, 2023, at about 17:32 p.m., COUNTY staff took LEWANDOWSKI to the Emergency Department at Trinity Hospital because he was: "Altered Mental Status/unresponsive". LEWANDOWSKI was determined to be dehydrated, from refusing to drink water. LEWANDOWSKI was then placed on suicide watch. Later, upon returning to COUNTY's jail, at about 22:44 p.m., COUNTY employees noted of LEWANDOWSKI: "Subject has not eaten in 5 days. Subject is to remain on watch. Officer Mucklow is going to get Subject a smock to lay on so he will have for comfort. Next crisis worker is to check on subject." Later that evening, at about 23:00 p.m., a TCBHS provider stated of LEWANDWOSKI that he had confusion, rapidly changing moods, and feelings of hopelessness. The TCBHS provider kept the Decedent on suicide watch.

67. On February 16, 2023, LEWANDOWSKI was evaluated by Defendant MICHAEL

NOVAK, P.A., after his ER admission. As the highest level care provider, Defendant NOVAK had a duty to evaluate the Decedent's medical needs, and to formulate and execute an individualized treatment plan and safety plan. As part of this, Defendant NOVAK had a duty to review and familiarize himself with LEWANDOWSKI's medical and mental health history, particularly from the readily available UCD medical records and discharge documents, which would have indicated to Defendant NOVAK that the Decedent had a number of chronic and acute suicide risk factors, very few protective factors, severe mental illness, and had remained at a moderate to high risk during the entire time he was hospitalized at UCD Medical Center. Furthermore, Defendant NOVAK failed to formulate and execute an individualized treatment plan and safety plan for LEWANDOWSKI, and failed to refer LEWANDOWSKI for intensive and daily therapy to treat his hopelessness, failed to order adequate treatment for the Decedent's auditory hallucinations, failed to prescribe that he receive sufficient out of cell time, failed to prescribe that he receive adequate contact with his family – a potential protective factor – and failed to order that he receive a full and comprehensive psychiatric evaluation, with deliberate indifference to LEWANDOWSKI's serious medical needs,

68. On February 16, 2023, at about 7:25 p.m., Defendant KRONER saw the Decedent, and released him from suicide watch, discontinuing suicide precautions.

69. However, in doing this, on information and belief, Defendant KRONER failed to perform a competent and comprehensive suicide-risk assessment, thereby improperly releasing LEWANDOWSKI from suicide precautions when he continued to pose a significant chronic and acute risk of suicide. Furthermore, Defendant KRONER failed to formulate and execute an individualized treatment plan and safety plan for LEWANDOWSKI, and failed to refer LEWANDOWSKI for intensive and daily therapy to treat his hopelessness, failed to order adequate treatment for the Decedent's auditory hallucinations, failed to prescribe that he receive sufficient out of cell time, failed to prescribe that he receive adequate contact with his family – a potential protective factor – and failed to order that he receive a full and comprehensive psychiatric evaluation, with deliberate indifference to LEWANDOWSKI's serious medical needs,

70. During February 16, 2023–February 23, 2023, LEWANDOWSKI continued to suffer from depression and psychosis and his condition deteriorated rapidly.

71. Additionally, LEWANDOWSKI was supposed to be receiving physical therapy as part of the discharge orders for him to rehabilitate as much as possible from being stabbed in the eye, but, on information and belief, he was not receiving the requisite physical therapy while was incarcerated in the COUNTY's jail, which resulted in physical ailments that exacerbated and worsened his serious, untreated mental illness, and added to his hopelessness as a result of the physical disability posed by his serious eye injury.

72. Additionally, on information and belief, various COUNTY employees, including, but not limited to, Defendant WHITMAN and other Sheriff's personnel, including the custodial staff at the COUNTY's jail, were notified of LEWANDOWSKI's chronic and acute risk of suicide, and suicidal ideations, by LEWANDOWSKI's family.

73. On or about February 20, 2023, the Decedent's mother, Lisa Nugent, called the COUNTY's jail and reported to COUNTY's jail personnel that LEWANDOWSKI was mentally ill and suicidal.

74. Indeed, on multiple occasions during LEWANDOWSKI's incarceration in the COUNTY's jail, Ms. Nugent reported that LEWANDOWSKI was mentally ill and suicidal. Ms. Nugent spoke to Defendant Trinity County Sheriff's Corporal RON WHITMAN on multiple occasions, including the day LEWANDOWSKI's incarceration commenced, the day of LEWANDOWSKI's arraignment, and other days.

75. On more than occasion, Ms. Nugent told Defendant WHITMAN that LEWANDOWSKI was mentally ill and suicidal. Corporal WHITMAN, a law-enforcement officer without mental-health credentials, and an individual unqualified to perform an adequate and comprehensive suicide risk assessment, with deliberate indifference, responded on one or more occasion to Ms. Nugent that LEWANDOWSKI was not actually suicidal or was "faking it."

76. Between February 20, 2023—February 23, 2023, LEWANDOWSKI expressed suicidal ideations, as his mental health continued to progressively deteriorate and he became more

*S.L. v. County of Trinity, et al.*
FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
Case No. 3:24-cv-02211

21

hopeless, without any therapeutic treatment, being fearful because of the seriousness of the charges he faced, being stuck in his small cell for 23 hours of the day.

77. Throughout LEWANDOWSKI's incarceration in the COUNTY's jail, Ms. Nugent reported to whomever answered her telephone calls at the jail that LEWANDOWSKI was suicidal and mentally ill, and that she feared for his safety and wellbeing.

78. Multiple commonly understood suicide risk factors—both chronic and acute—persisted throughout LEWANDOWSKI's incarceration, including, but not limited to: his feeling that for the past 4-6 years, his life had been going downhill; that his ex-wife had divorced him, taking custody of his teenage daughter; that he had attempted suicide at least twice in the past; that he felt alone; that he had nobody to support him; that he had a serious psychiatric disorder; that he was experiencing auditory hallucinations; that he was facing serious charges that carried a long prison sentence; that his mental illness was being untreated; that he could not sleep; that he was grappling with a new and serious disability by virtue of the serious injury to his eye; and that he felt hopeless and alone.

79. Throughout his incarceration in the COUNTY's jail, but particularly from February 16, 2023–February 26, 2023, LEWANDOWSKI remained at a significantly elevated suicide risk.

80. On February 23, 2023, LEWANDOWSKI completed a written form in which he: (1) reported that he could not sleep at all because "voices" kept him up at night and "won't stop;" and (2) initialed a box requesting to be seen by mental-health staff urgently.

81. LEWANDOWSKI was suffering from auditory hallucinations, which, on information and belief, were telling him to harm himself, as part of a psychiatric emergency.

82. Later, on February 23, 2023, Defendant TREANOR received LEWANDOWSKI's written form, and dismissed LEWANDOWSKI's request, instead of taking appropriate action or summoning a qualified mental health professional that was adequately trained and competent to perform a comprehensive suicide risk assessment. TREANOR lacked the qualifications to determine whether or not LEWANDOWSKI was suicidal. Defendant TREANOR failed to refer LEWANDOWSKI for the immediate psychiatric evaluation and treatment that he desperately

needed, and he failed to put LEWANDOWSKI on any kind of suicide precautions, and continued to permit LEWANDOWSKI to access materials with which he could harm himself, including bedding and other materials that could be used as ligatures, all despite LEWANDOWSKI's chronic and acute risk of suicide.

83. On February 26, 2023, LEWANDOWSKI's condition was precipitously worsening, and he was hopeless and posed a high chronic and acute risk for suicide; consequently, he attempted to call his mother, Lisa Nugent, but the COUNTY jail staff refused to permit him to do so, ordering the Decedent to return to his cell and stay there on lockdown. Compounding this problem, the TCJ does not have any mental-health personnel on staff, and February 26, 2023, was a Sunday, so, pursuant to the COUNTY's unconstitutional policy, practice, or custom, there would be no mental staff at the jail for at least three more days, until Wednesday, March 1, 2023.

84. As noted above, LEWANDOWSKI had been on and continued for the entirety of his incarceration to be on what is known as colloquially as "lockdown", a form of restrictive housing, which is also known as solitary confinement, segregation, or isolation. During his incarceration in COUNTY's jail, the Decedent was only allowed out of his cell for one hour per day, and on information and belief, the Decedent was not even granted his entire hour on February 26, 2023, and either way, he was wrongfully deprived of the opportunity to call his mother at that time— who may have provided some emotional support and hope for LEWANDOWSKI, an acutely suicidal person.

85. During his incarceration as a pretrial detainee in the COUNTY's jail, while on lockdown, LEWANDOWSKI was housed for 23 out of the 24 hours in the day in a cell that was only 13 feet in length, 6'8 ½ inches wide, and 9'4 inches from the floor to the ceiling. The cell consisted of a stainless-steel sink/toilet combination, two stacked sleeping areas, and a small stainless-steel countertop in the corner, with a stool bolted into the flooring underneath the counter. The cell was illuminated with a fluorescent light fixture in the ceiling.

86. Well before LEWANDOWSKI was even in this small cell, however, he should have been either taken to an inpatient, locked psychiatric facility, pursuant to Welfare and Institutions Code

*S.L. v. County of Trinity, et al.*
FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
Case No. 3:24-cv-02211

23

§ 5150—at least as of February 23, 2023, when he indicated his suicidal ideation on the COUNTY's request for behavioral health services form– or he should have been placed on suicide watch in a suicide resistant cell; or, at minimum, he should have been subject to high risk suicide precautions that prevented his access to any ligature devices and required that he either be under constant observation or that welfare checks be done on him by TCJ staff in staggered intervals, no more than 15-minutes apart.

87. On February 26, 2023, LEWANDOWSKI fashioned a noose by using a standard issue bedsheet—which he should not have had access to—as a ligature device; he then slid the sheet under the ceiling light fixture, stepped off of the toilet in his cell, and asphyxiated himself. He was found hanging.  He was cut down and noted to be pulseless and apneic. CPR was started. It was noted that LEWANDOWSKI may have had a fairly long down time prior to CPR. He was taken to Trinity Hospital.

88. On February 27, 2023, at about 05:08 a.m., LEWANDOWSKI was readmitted to Mercy Medical Center, from Trinity hospital.

89. On March 2, 2023, at about 12:51 p.m., LEWANDOWSKI was declared brain dead from the anoxic brain injury he had suffered from the hanging.

90. Under Defendant  SAXON's tenure, and because of the continued unconstitutional policies and customs described herein, inmate self-harm, including attempted and completed inmate suicides, as well as in-custody deaths, have continued to occur at the COUNTY's jail, the TCJ, after LEWANDOWSKI's suicide death.

91. For example, on January 8, 2024, the COUNTY, by and through Defendant SAXON, confirmed that on that same date a Correctional Deputy found John Swain deceased in one of the COUNTY's jail cells. On January 18, 2024, the COUNTY, by and through Defendant SAXON, confirmed that John Swain, a pretrial detainee, died on January 8, 2024, of asphyxiation due to self-strangulation.

92. On January 14, 2024, the COUNTY, by and through Defendant SAXON, confirmed that Joshua Garbutt had had been found deceased in one of the COUNTY's jail cells.

93. As a direct and proximate result of each Defendant's acts and/or omissions, as set forth above, to the extent permitted and pleaded by the various legal claims set forth below, Plaintiff sustained the following injuries and damages, past and future, among others:

a.      Wrongful death of ARON LEWANDOWSKI, pursuant to California Code of Civil Procedure § 377.60, *et seq.*;

b.      Loss of support and familial relationships, including loss of love, companionship, comfort, affection, society, services, solace, and moral support, pursuant to California Code of Civil Procedure § 377.60 *et seq.*;

c.      Loss of Plaintiff's relationship with the Decedent, pursuant to federal civil rights law;

d.      ARON LEWANDOWSKI's hospital and medical expenses, pursuant to California Code of Civil Procedure § 377.20, et seq.;

e.      ARON LEWANDOWSKI's coroner's fees and funeral and burial expenses, pursuant to California Code of Civil Procedure § 377.20 et seq.;

f.      Violation of ARON LEWANDOWSKI's constitutional rights, pursuant to California Code of Civil Procedure § 377.20 et seq. and federal civil-rights law;

g.      ARON LEWANDOWSKI's pre-death pain, suffering, or disfigurement, pursuant to state law, pursuant to California Code of Civil Procedure § 377.34;

h.      ARON LEWANDOWSKI's loss of life, pursuant to federal civil-rights law;

i.      ARON LEWANDOWSKI's conscious pain and suffering, pursuant to federal civil-rights law; and

j.      All damages and penalties recoverable under 42 U.S.C. §§ 1983 and 1988, California Civil Code §§ 52 and 52.1 et seq., California Code of Civil Procedure § 1021.5, and as otherwise allowed under California and United States statutes, codes, and common law.

//

//

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983)**
**PLAINTIFFS AGAINST DEFENDANTS SAXON, WHITMAN, FORD, TREANOR,**
**ROBBINS, CESSNA-SMITH, NOVAK, KRONER, and DOES 11-50**

94. Plaintiff re-alleges and incorporates by reference each and every allegation contained in this complaint, as though fully set forth here.

95. By the actions and omissions described above, the Defendants named in this cause of action and DOES 11–50, acting under the color of state law in their individual capacities, deprived ARON LEWANDOWSKI as a pretrial detainee of the rights, privileges, and immunities secured by the Fourteenth Amendment by subjecting him, or through their deliberate indifference, allowing others to subject him, to delay and denial of access to medical or mental health care for a serious, but treatable, medical or mental-health condition.

96. The listed Defendants knew that ARON LEWANDOWSKI's mental health condition was serious, but treatable, and knew or must have known that he required access and delivery to urgently needed medical/mental health care; Defendants further had a duty to provide ARON LEWANDOWSKI reasonable security and safe, appropriate housing and monitoring to accommodate his mental health condition.

97. The listed Defendants ignored, delayed, or denied to ARON LEWANDOWSKI urgently needed medical and psychiatric care and treatment. As a result of the Defendants' deliberate indifference to both ARON LEWANDOWSKI's need for medical care and treatment and his mental health condition, Plaintiff suffered damages and deprivation of constitutional rights, as described herein. By the actions and omissions described above, the individually named Defendants violated 42 U.S.C. § 1983, depriving Plaintiff and Decedent of the following well-settled constitutional rights that are protected by the First and Fourteenth Amendments to the U.S. Constitution:

    a. The right to be free from deliberate indifference to ARON LEWANDOWSKI's serious medical needs while in custody and confined in jail as a pretrial detainee,

as secured by the Fourteenth Amendment; and,

    b. The right to be free from wrongful government interference with familial relationships and Plaintiff's and Decedent's right to companionship, society, and support, as secured by the First and Fourteenth Amendments.

98. The listed Defendants' failure to intervene, prevent, or stop the constitutional violations by others, when Defendants were in a position to so intervene when such violations were occurring, also renders such Defendant(s) liable for these violations.

99. Defendants subjected Plaintiff and Decedent to their wrongful conduct, depriving Plaintiff and Decedent of the rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Plaintiffs (individually and on behalf of LEWANDOWSKI) and others would be violated by their acts and/or omissions.

100. As a proximate result of the foregoing wrongful acts and/or omissions, Plaintiff and Decedent sustained injuries and damages, as set forth above, in ¶ 93. Plaintiff is, therefore, entitled to general and compensatory damages in an amount to be proven at trial.

101. In committing the acts alleged above, the individually named Defendants and DOE Defendants acted maliciously and/or were guilty of a wanton and reckless disregard for the rights, safety, and emotional well-being of Plaintiff and Decedent, and by reason thereof, Plaintiff is entitled to punitive damages and penalties allowable under 42 U.S.C. § 1983, California Code of Civil Procedure §§ 377.20 et seq, and other state and federal law against these individual Defendants; no punitive damages are sought directly against the COUNTY.

102. Plaintiff is also entitled to reasonable costs and attorney's fees under 42 U.S.C. § 1988 and other applicable California codes and laws.

## SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983 – *Monell* and Supervisory Liability)
### PLAINTIFF AGAINST DEFENDANTS COUNTY OF TRINITY, SAXON, WHITMAN, FORD, CESSNA-SMITH, and DOES 1–10

103. Plaintiff re-alleges and incorporates by reference each and every allegation contained in this complaint, as though fully set forth herein.

104. As supervisors, Defendants Sheriff SAXON, Corporal WHITMAN, Sergeant

*S.L. v. County of Trinity, et al.*
FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
Case No. 3:24-cv-02211

27

FORD, Director CESSNA-SMITH, and DOES 1-10 each permitted and failed to prevent the unconstitutional acts of other Defendants and individuals under their supervision and control, and failed to properly supervise such individuals, with deliberate indifference to the rights and serious medical needs of ARON LEWANDOWSKI. Each of these supervising Defendants either directed her or his subordinates in conduct that violated Decedent's rights, OR set in motion a series of acts and omissions by his or her subordinates that the supervisor knew or reasonably should have known would deprive Decedent of rights, OR knew his or her subordinates were engaging in acts likely to deprive Decedent of rights and failed to act to prevent his or her subordinate from engaging in such conduct, OR disregarded the consequence of a known or obvious training deficiency that she or he must have known would cause subordinates to violate Decedent's rights, and in fact did cause the violation of Decedent's rights. *See* Ninth Circuit Model Civil Jury Instruction 9.4. Furthermore, each of these supervising Defendants is liable in their failures to intervene in their subordinates' apparent violations of Decedents' rights.

105.     On information and belief, no adequate Suicide Risk Assessment tool ("SRA") was implemented in COUNTY's jail prior to the Decedent's suicide, which was needed by COUNTY to both initiate suicide precautions in COUNTY's jail and discharge inmates from suicide precautions, and it was needed for guiding the initiation of 5150 holds, but it either was never promulgated, never implemented, has not been enforced, is inadequate, or was not followed with respect to Decedent.

106.     Prior to Decedent's incarceration, on information and belief, the COUNTY and their policymakers and administrators were aware of the need to have a policy that only allowed jail staff to discontinue suicide precautions after a comprehensive suicide risk assessment had been conducted by a qualified mental health professional, for jail medical staff to perform an appropriate assessment before the scheduled release of an inmate on suicide precautions, for inmates discharged from suicide precautions to get an appropriate, individualized treatment plan, safety plan, therapy, and follow-up assessments by staff, and that COUNTY Behavioral Health Services staff needed to be adequately trained on the desperately needed, comprehensive Suicide Risk

Assessment methodology and development of individualized treatment plans, with the training to be developed for new and existing COUNTY employees, along with regular refresher training. Additionally, the COUNTY and its respective policymakers and administrators were aware that this training needed to include avoiding negative attitudes, avoiding and disallowing cynical attitudes about suicidal ideation, the impact of correctional environments on suicidal behavior, predisposing factors, acute and chronic risk factors, high-risk time periods, warning signs, and a suicide prevention policy, inter alia.

107.    Despite the obvious and immediate treatment needs of its inmate population for mental health services to be available 24 hours per day, 7 days per week, Defendants Sheriff SAXON and Director CESSNA-SMITH have perpetuated and executed an unconstitutional policy, custom, or practice of the COUNTY, by and through its agencies, including the TCSO and the TCBHS, of restricting mental-health care in the COUNTY's jail to Wednesdays only. Although the policy, custom, or practice – which is reflected in the COUNTY's "TRINITY COUNTY DETENTION FACILITY INMATE REQUEST FOR BEHAVIORAL HEALTH SERVICES" form – provides a box for an inmate to initial if the inmate believes their "condition presents an urgent risk to yourself or others," even an inmate indicating their condition presents an urgent risk to themselves will not necessarily be seen; the actual execution and operation of this policy, custom, or practice by Defendants is that an untrained Correctional Officer receives the request form from an inmate and acts as the gatekeeper for whether a mentally unwell – including a suicidal – inmate will be seen by a mental health professional. Consequently, if an inmate is having a mental-health emergency requiring immediate treatment on any day except a Wednesday, the COUNTY does not have any mental-health care professionals available at its jail to assess and treat inmates, and, thus, an inmate will not be seen, unless, on information and belief, untrained, unqualified Correctional Officers and/or Sheriff's Deputies (who are not mental health professionals) exercise their unbridled and unmerited medical decision-making power and summon such care. The COUNTY's untrained, unqualified Correctional Officers and Sheriff's Deputies, such as Defendants TREANOR, ROBBINS, and others, are neither trained nor qualified

to perform the comprehensive suicide risk assessment that is required to respond to an inmate reporting they have a condition presenting an urgent risk to themselves. Compounding this constitutional infirmity in the COUNTY's policy, custom, and practice, nothing in the policy, custom, or practice dictates that the unqualified Correctional Officer, Sheriff's Deputy, or other COUNTY employee that receives and processes and inmate's request for behavioral health services – including a request for urgent mental health care – either (a) automatically summon a mental health professional that is qualified to perform a comprehensive suicide risk assessment or (b) initiate a Welfare and Institutions Code § 5150 hold. Consequently, the COUNTY's policy results in unqualified and untrained correctional personnel failing to conduct comprehensive suicide risk assessments, failing to summon mental health care, and unconstitutionally and inappropriately acting as gatekeepers for urgent mental health care.

108.    On information and belief, despite this knowledge that the COUNTY, including the named Defendants as well as their agencies' policymakers and administrators, had at least as of prior to the Decedent's incarceration, and in fact had much earlier, they failed to implement and/or enforce and/or properly execute these drastically needed suicide prevention policies, which failure was a moving force and proximate cause of the deprivations of Plaintiff's and Decedent's clearly established and well-settled constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above in the First Cause of Action.

109.    Plaintiff alleges, upon information and belief, the unconstitutional actions and/or omissions of the individually named COUNTY Defendants were pursuant to the following customs, policies, practices and/or procedures of the COUNTY, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policy making officials for the COUNTY and its agencies, including Defendants SAXON, CESSNA-SMITH, DOES 1–10, the TCSO and the TCBHS:

        a.  Failing to create, implement, and execute a policy that ensures appropriate continuity of care, when an inmate is transferred from the care of an inpatient medical facility, such as a hospital, to the COUNTY's jail, and failing to implement and execute a policy that ensures that the same level of care and safety be provided and afforded to the COUNTY's inmate that the inmate was receiving at the inpatient

medical facility;

b.   Failing to create, implement, and execute a policy that ensures that comprehensive suicide risk assessments are conducted – and that all safety measures and suicide precautions are implemented – to ensure the safety of a suicidal pretrial detainee that is being removed from an inpatient medical facility at the direction and pursuant to the actual or apparent legal authority of the COUNTY's Sheriff's Office and being taken to the COUNTY's jail;

c.   Permitting unqualified Correctional Officers and Sheriff's Deputies to act as gatekeepers for urgent mental health care;

d.   Permitting other unqualified COUNTY Sheriff's Office personnel to act as gatekeepers for urgent mental health care, by failing to design and execute a system that requires a mental health evaluation and comprehensive suicide risk assessment by a qualified mental health professional when COUNTY's jail personnel receives a report that one of its inmates has expressed suicidal ideation;

e.   Denying inmates at the COUNTY's jail access to appropriate, competent, and necessary care for serious medical and psychiatric needs, including, but not limited to, by restricting mental-health care in the COUNTY's jail to Wednesdays only, by failing to staff its jail with properly trained mental health professionals that are trained and in fact do conduct comprehensive suicide risk assessments, and/or otherwise failing to require that all mental health staff at the jail be properly trained, supervised, credentialed, or licensed as required by law;

f.   Failing to implement and/or enforce and/or properly execute drastically needed suicide prevention policies, which COUNTY knew and/or had reason to know were needed;

g.   Failing to ensure that suicide precautions are not lifted without a proper and comprehensive suicide risk assessment – conducted by a mental health professional appropriately credentialed, trained, and qualified to perform one – and without implementing reasonable prevention precautions, as well as formulating and executing a safety plan for the individual;

h.   Failing to ensure an individualized treatment plan is formulated, documented, and followed before suicide prevention precautions are lifted;

i.   Failing to ensure an individualized safety plan is formulated, documented, and followed prior to the lifting of suicide safety precautions, and afterwards;

//

j.  Failing to properly classify, house, and/or monitor inmates suffering from mental health disabilities, including placement on suicide watch with proper suicide precautions, including failing to consider in any way the clear and obvious danger of placing inmates at risk of suicide in cells with means to hang and injure themselves (including light fixtures that the COUNTY knew or had reason to know were not properly flush mount, and ligature materials) and without the frequent, logged observation required by the law and best suicide prevention practices;

k.  Allowing, encouraging, and requiring unlicensed, inadequately trained, or inadequately supervised COUNTY custodial staff, contracted medical staff, or COUNTY Behavioral Health Services staff to make decisions to place jail inmates on, and remove inmates from, suicide watch, in direct violation of applicable law and correctional health standards, including permitting unlicensed and/or untrained correctional, medical, and/or mental health staff to remove severely mentally ill inmates from suicide watch without a reasonable, appropriate, and lawful basis for doing so, and without an appropriate, individualized treatment plan and safety plan in place;

l.  Failing to institute proper procedures and training to coordinate inmate assessment, placement, suicide watch decisions, transfers to psychiatric facilities, and care with the COUNTY and contracted medical staff, Behavioral Health Services staff, other medical staff, court, and/or jail/corrections staff, where there was an obvious need for such to prevent the type of tragedy that occurred in this case;

m.  Failing to institute, require, and enforce proper and adequate training, supervision, policies, and procedures for handling, housing, and caring for mentally ill and/or emotionally disturbed inmates at the COUNTY's jail, the TCJ, including alternatives to placing such ill and disturbed inmates that are in need of treatment in solitary confinement or segregation cells that are intended and used to punish inmates, with the obvious consequence that the mental health needs of such inmates remain unaddressed and are in fact aggravated and increased by such punitive and detrimental treatment; and,

n.  Failing to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a) through (m) above, when the need for such was obvious, with deliberate indifference to the rights and safety of Plaintiffs, Decedent, and the public, and in the face of an obvious need for such policies, procedures, and training programs.

110.    In the alternative, upon information and belief, Defendant COUNTY may have instituted policies or training addressing some or all the topics listed above, but with deliberate

indifference to citizens' rights, failed to properly oversee, enforce, and/or properly carry out such policies and/or training.

111.    The above-described customs, policies, practices, and/or procedures of the COUNTY were a moving force and/or a proximate cause of the deprivations of Plaintiff's and Decedent's constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above in the First Cause of Action.

112.     Defendant COUNTY is also liable for the violations of Plaintiff's and Decedent's rights by their final policy makers, as described above. *See* Ninth Circuit Model Civil Jury Instruction No. 9.6.

113.     On information and belief, the COUNTY conducted an investigation and review of this matter leading to the in-custody death of ARON LEWANDOWSKI, and Defendants SAXON and DOES 1-10 directly and personally participated in such investigation and review. The unconstitutional actions and/or omissions of the individually named Defendants, DOES 1-10, and other COUNTY personnel, as described above, were approved, tolerated, and/or ratified by policy making officials for the COUNTY. Plaintiff is informed and believes, and thereupon alleges, the details of this incident have been revealed to the authorized policy makers within the COUNTY, including Defendants SAXON and CESSNA-SMITH – and other authorized policymakers in the COUNTY agencies listed above – the TCSO and TCBHS – and that such policymakers have direct knowledge of the fact that ARON LEWANDOWSKI was unlawfully denied necessary care for his serious medical needs due to their and their subordinates' tortious and constitutionally violative acts and/or omissions, as well as their misconduct and violations of Decedent's rights. Notwithstanding this knowledge, the authorized policymakers within the COUNTY, including the various COUNTY agencies listed above, have approved of the individually named Defendants' and DOES 1-10s' conduct and decisions in this matter to the extent such individuals were under their supervision and oversight, and have made a deliberate, conscious, and affirmative choice to endorse and ratify such conduct and decisions, and the basis for them, which resulted in the death of ARON LEWANDOWSKI. By so doing, the authorized

policymakers within the COUNTY have shown affirmative agreement with the conduct of the individual Defendants and other employees/agents under their supervision, and have ratified the unconstitutional acts of these individual Defendants, employees, and agents.

114.    The aforementioned customs, policies, practices, and procedures; the failure to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and, the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of individual Defendants were a moving force and/or a proximate cause of the deprivations of Plaintiff's and Decedent's clearly established and well-settled constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above in the First Cause of Action.

115.    As a direct and proximate result of the foregoing unconstitutional actions, omissions, customs, polices, practices, and/or procedures of Defendants SAXON, WHITMAN, FORD, CESSNA-SMITH, and DOES 1–10, or the lack or inadequacy thereof, Plaintiff sustained serious and permanent injuries and damages, and is entitled to damages, penalties, costs, and attorneys' fees, as set forth above, in ¶ 93, and punitive damages against Defendants SAXON, WHITMAN, FORD, CESSNA-SMITH, and DOES 1–10, in their individual capacities.

### THIRD CAUSE OF ACTION
### (VIOLATION OF CALIFORNIA CIVIL CODE § 52.1 (b) – BANE ACT)
### PLAINTIFF AGAINST DEFENDANTS COUNTY, SAXON, WHITMAN, FORD, TREANOR, ROBBINS, CESSNA-SMITH, NOVAK, KRONER, and DOES 11-50

116.    Plaintiff re-alleges and incorporates by reference each and every paragraph contained in this complaint, as if fully set forth here.

117.    By their acts, omissions, customs, and policies, each Defendant, acting in concert/conspiracy, as described above, interfered with, and/or attempted to interfere with, by acting with a reckless disregard for Plaintiff's and Decedent's rights, violated Plaintiff's and Decedent's rights under California Civil Code § 52.1, by violating the following clearly established rights under the United States Constitution and the California Constitution:

  a.  Decedent's right to be free from an unreasonable ongoing seizure as a pretrial detainee, as secured by the Fourth and Fourteenth Amendments to the United States Constitution and the California Constitution, Article 1, Sections 7 and 13;

     b.   Decedent's right to be free from deliberate indifference to his serious medical needs while in custody as a pretrial detainee, as secured by the Fourteenth Amendment to the United States Constitution and the California Constitution, Article 1, Section 7;

     c.   Plaintiff's and Decedent's right to be free from wrongful government interference with familial relationships and Plaintiff's and Decedent's right to companionship, society, and support of each other, as secured by the First and Fourteenth Amendments;

     d.   Plaintiff's and Decedent's right to enjoy and defend life and liberty; acquire, possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, Section 1;

     e.   The right to protection from bodily restraint, harm, or personal insult, as secured by California Civil Code § 43; and,

     f.   Decedent's right to medical care, as secured and required by California Government Code § 845.6.

118.     Alternatively, or concurrently, the threat, intimidation, and coercion described herein was neither necessary nor inherent to Defendants' violation of Decedent's and Plaintiff's rights, nor to any legitimate COUNTY jail or law enforcement activity.

119.     Further, all of Defendants' violations of duties and rights and coercive conduct, described herein, were volitional acts; none were accidental or merely negligent.

120.     To the extent this claim is based on a violation of Decedent's rights, it is asserted as a survival claim. To the extent that the violations of rights were suffered by Plaintiff, it is asserted as a direct, wrongful death claim. To the extent the violations were done to both Decedent and Plaintiff, it is asserted as both a survival and wrongful death claim.

121.     The COUNTY is liable under California Government Code § 815.2 for injury proximately caused by an act or omission of an employee, committed within the course and scope of the employees' employment.

122.     As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of Plaintiff's and Decedent's rights under the United States and California Constitutions and law, Plaintiff sustained injuries and damages, and against each and every Defendant is entitled

to relief as set forth above, in ¶ 93, and to punitive damages against the individual Defendants and DOES 11–50 in their individual capacities, including all damages allowed by California Civil Code §§ 52, 52.1, and California law, including costs, attorneys' fees, three times actual damages, and civil penalties.

**FOURTH CAUSE OF ACTION**
**(VIOLATION OF CALIFORNIA GOVERNMENT CODE § 845.6)**
**PLAINTIFF AGAINST DEFENDANTS COUNTY, WHITMAN, FORD, TREANOR, ROBBINS, and DOES 11-50**

123.     Plaintiff re-alleges and incorporates by reference each and every paragraph contained in this complaint, as if fully set forth here.

124.     Defendants WHITMAN, FORD, TREANOR, ROBBINS, and DOES 11-50 knew or had reason to know that ARON LEWANDOWSKI was in need of an appropriate suicide risk evaluation by a qualified mental health professional and was in need of immediate and a higher level of mental health, medical, and psychiatric care, treatment, therapy, and observation and monitoring, and that in the meantime, he required special housing and security – including being placed on suicide watch and on suicide precautions – for his own safety and well-being, and each Defendant failed to take reasonable action to summon and/or to provide him access to such medical care and treatment and/or provide him housing accommodations necessary for him to remain safe under such circumstances. Each such individual Defendant, employed by and acting within the course and scope of his or her employment with Defendant COUNTY, knowing and/or having reasons to know this, failed to take reasonable action to summon and/or provide LEWANDOWSKI access to such care, treatment, and medically appropriate housing in violation of California Government Code § 845.6.

125.     The COUNTY is liable under California Government Code § 815.2 for injury proximately caused by an act or omission of an employee, committed within the course and scope of the employees' employment.

126.     As a proximate result of Defendants' negligence, Plaintiff sustained injuries and damages, and against each listed Defendant in this Cause of Action is entitled to the relief

described above, in ¶ 93. Plaintiff also seeks punitive damages against such individual Defendants in their individual capacities. Plaintiff does not seek punitive damages directly against the COUNTY.

**FIFTH CAUSE OF ACTION**
**(NEGLIGENCE)**
**PLAINTIFF AGAINST DEFENDANTS COUNTY, SAXON, WHITMAN, FORD,**
**TREANOR, ROBBINS, CESSNA-SMITH,  KRONER, and DOES 11-50**

127.        Plaintiff re-alleges and incorporates by reference each and every paragraph contained in this complaint, as if fully set forth here.

128.        At all material times, Defendants COUNTY, SAXON, WHITMAN, FORD, TREANOR, ROBBINS, CESSNA-SMITH, KRONER, and DOES 11-50 owed LEWANDOWSKI the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

129.        At all material times, each Defendant owed LEWANDOWSKI the duty to act with reasonable care.

130.        These general duties of reasonable care and due care owed to ARON LEWANDOWSKI by all Defendants include, but were not limited, to the following specific obligations:

    a.  To provide, or have provided, prompt and timely access to appropriate treatment and safety from the grave danger LEWANDOWSKI posed to himself;

    b.  To avoid housing LEWANDOWSKI in a cell that constituted an unreasonably dangerous condition of public property for a mentally ill and suicidal person;

    c.  To provide safe and appropriate jail custody for LEWANDOWSKI, including reasonable and safe classification, monitoring, and housing, including placing him on suicide watch with proper suicide precautions, and preventing access to physical conditions and items that could foreseeably be used for suicide;

    d.  To summon necessary and appropriate medical care for LEWANDOWSKI;

    e.  To provide safe and appropriate jail custody for LEWANDOWSKI,

including appropriate suicide precautions and direct visual safety checks at an appropriate interval;

f.  To use generally accepted law enforcement and jail procedures that are reasonable and appropriate for Plaintiff's status as a mentally ill and/or emotionally disturbed person;

g.  To use generally accepted custodial health care and suicide prevention procedures that are reasonable and appropriate for Plaintiff's status as a mentally ill and/or emotionally disturbed person;

h.  To implement and/or enforce and/or properly execute drastically needed suicide prevention policies, which COUNTY officials knew and/or had reason to know were needed;

i.  To properly classify, house, and/or monitor inmates suffering from mental health disabilities, including placement on suicide watch with proper suicide precautions, and to initiate and/or not remove an inmate from a 5150 hold without a proper and comprehensive suicide risk assessment, as well as considering the clear and obvious danger of placing inmates at risk of suicide in cells with means to hang and injure themselves (including lights that are not properly flush mount, other possible hanging points, standard issue bedding, clothing, and other ligature materials) and without the frequent, logged observation required by appropriate policies, practices, or the law;

j.  To refrain from abusing their authority granted to them by law; and,

k.  To refrain from violating Plaintiffs' rights guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

131.    By the acts and omissions set forth more fully in the paragraphs above, Defendants acted negligently and breached their duty of due care, which foreseeably resulted in the suffering of damages by ARON LEWANDOWSKI and Plaintiff.

132.    Defendants, through their acts and omissions, breached the aforementioned duties owed to LEWANDOWSKI and Plaintiff.

133.    Defendant COUNTY is vicariously liable, pursuant to California Government Code section 815.2.

134.    As a proximate result of Defendants' negligence, Plaintiff sustained injuries and damages, and against each listed Defendant in this Cause of Action is entitled to the relief

described above, in ¶ 93. Plaintiff also seeks punitive damages against such individual Defendants in their individual capacities. Plaintiff does not seek punitive damages against the COUNTY.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief against each and every Defendant herein, jointly and severally:

      a.  Compensatory and exemplary damages in an amount according to proof and which is fair, just, and reasonable;

      b.  Punitive damages under 42 U.S.C. § 1983 and California law in an amount according to proof and which is fair, just, and reasonable;

      c.  All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 U.S.C. §§ 1983 and 1988; California Code of Civil Procedure §§ 377.20 et seq., 377.60 et seq., and 1021.5; California Code of Civil Procedure § 377.34; California Civil Code §§ 52 et seq., 52.1; and as otherwise may be allowed by California and/or federal law;

      d.  Such further relief, according to proof, that this Court deems appropriate and lawful.

## JURY TRIAL DEMAND

Plaintiff hereby respectfully demands a jury trial, pursuant to Federal Rule of Civil Procedure 38, for all claims for which a jury is permitted.

Dated: April 17, 2024             **LAW OFFICE OF SANJAY S. SCHMIDT**
                                    -and-
                                    **HELM LAW OFFICE, PC**

                                    */s/ Sanjay S. Schmidt*
                                    By: SANJAY S. SCHMIDT
                                    Attorneys for Plaintiff,
                                    S.L., a minor, by and through her
                                    proposed guardian ad litem, KAREN JOSEPHS